

**U.S. Department of Justice**

_United States Attorney_
_Eastern District of New York_

EWS:AVR                                 _271 Cadman Plaza East_
F. #2026V01051                          _Brooklyn, New York 11201_

April 29, 2026

<u>By ECF & E-Mail</u>

The Honorable Frederic Block
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    Laith Nakli v. United States of America
>        Civil Case No. 26-1515 (FB)

Dear Judge Block:

The government respectfully submits this letter in opposition to petitioner Laith Nakli's Verified Petition for a Writ of Error Coram Nobis (the "Petition"). <u>See</u> ECF 1. In his Petition, the petitioner asks the Court to vacate his 2000 guilty plea to drug offenses involving anabolic steroids and hydrocodone on the basis of ineffective assistance of counsel. The gravamen of the petitioner's claim is that his criminal defense attorney falsely advised him that he would not be deported as long as he avoided a prison sentence of one year or more, which caused the petitioner to plead guilty rather than take his case to trial or insist on a better plea deal.

The Petition should be denied because the petitioner has not demonstrated that he was provided with ineffective counsel in connection with his plea. Rather, the record demonstrates that the petitioner pleaded guilty to the drug offenses knowing that the convictions carried immigration consequences—and that he did so because he was, in fact, guilty, and because he wanted to secure a favorable sentence, which he did. As the petitioner admits, he has filed this petition twenty-six years after his conviction for one reason only: to find a path to legal status in the United States after all other options to secure legal status have failed. But coram nobis is not a vehicle of last resort for solving an immigration problem. It is an extraordinary legal remedy available to address real legal errors, and the petitioner has not identified any here. In any event, the Court's granting of the Petition would not achieve the petitioner's immigration objectives, as the petitioner's immigration ineligibility is also predicated on the fact that he made a materially false statement on his visa application.

For these reasons and the reasons that follow, the Court should deny the Petition.

I.        Relevant Factual Background

A.        The Petitioner Voluntarily and Knowingly Entered a Plea of Guilty After Being Advised of the Potential Penalties and Immigration Consequences

On January 19, 2000, the petitioner pleaded guilty to a superseding indictment charging him with four crimes: (1) conspiracy to possess with the intent to distribute anabolic steroids, in violation of 21 U.S.C. § 846; (2) conspiracy to possess with the intent to distribute hydrocodone, in violation of 21 U.S.C. § 846; (3) possession of anabolic steroid with intent to distribute, in violation of 21 U.S.C. § 841; and (4) possession of hydrocodone with intent to distribute, in violation of 21 U.S.C. § 841.  See Criminal Docket No. 98-721 (FB), at ECF 64; id., at ECF 71 (transcript), at 12:18-14:4.

At the outset of petitioner's plea hearing, petitioner swore to tell the truth under penalty of perjury and was warned about the consequences of failing to do so.  Criminal Docket No. 98-721 (FB), ECF 71 (transcript), at 7:14-15; id. at 8:1-7.  He confirmed that he was pleading guilty voluntarily and understood the trial rights he was giving up—including, among other things, the right to be "presumed innocent," which "the government would have to overcome . . . and prove [him] guilty by competent evidence beyond a reasonable doubt."  Id. at 15:24-16:2; id. at 20:15-17 (THE COURT: Are you making these pleas of guilty voluntarily and of your own free will? THE DEFENDANT: Yes, your Honor.)  The Court also specifically asked the petitioner whether "anyone threatened or forced [him] to plead guilty"; whether anyone "twisted [his] arm or put [him] under any duress or stress at all to do so"; and whether anyone "made any promise[s] to [him] as to what [his] sentence will be."  Id. at 20:18-21:1.  To each question, the petitioner responded "No, your Honor."  Id.

The Court inquired into the basis of the petitioner's decision to plead guilty.  The Court asked, "the reason why you wish to plead to the indictment as charged is because you do not want to go through the emotional upheaval of the trial or the expense of a trial.  You believe you are guilty and you want to avail yourself some consideration under our sentencing guidelines for accepting responsibility, so that your sentence would be less than it arguably would otherwise be if you were found guilty.  Does that fairly express your intentions and desires?"  Id. at 18:10-22.  The defendant responded, "Yes, your Honor."  Id.  Defendant's criminal defense attorney also explained to the Court that the petitioner did not "wish your Honor to have to sit at a trial in which he himself admits that he's done wrong."  Id. at 4:8-10.

Before taking his guilty plea, the Court asked the petitioner whether he had any questions about "the charges against you or your rights or anything else related to this matter," explaining that "[h]ere is your opportunity, if you are in doubt about anything whatsoever, to have it clarified by me, a chance for you to talk to the judge."  Id. at 19:8-14.  When the petitioner stated that he did not have any questions for the Court, the Court again reiterated that the petitioner was "not going to be able to come back later on and ask me questions.  This is the one shot you have. Do you understand that?" to which the petitioner responded: "Okay."  Id.  at 19:19-23.

After the Court provided these various warnings and satisfied itself that the petitioner understood the consequences of his decision to plea, the petitioner allocuted to the charged conduct.  He admitted that he was asked by a friend to do a "pickup for him," and that

2

"[k]nowing what he was involved in," he knew "what I was going to pick up…I was going to pick up some steroids." Id. at 23:24-24:12.  The petitioner added that he believed the person for whom he was picking up the drugs was going to "[s]ell them to others," and he understood it was "unlawful to do that."  Id. at 24:22-25:4; see id. at 29:5-18.  As the government explained during the hearing, the petitioner picked up "a massive amount of steroids, in the order of 50 boxes' worth," which were stored in "21 large garbage bags." Id. at 32:16-33:1.

During the change-of-plea proceeding, the Court summarized the potential penalties facing the petitioner if he were to plead guilty.  The Court advised that each count to which the petitioner was pleading provided for a statutory term of imprisonment of up to five years." Id. at 26:16-25, 27:6-7.  It also explained that "it is estimated that a range of imprisonment from 18 to 24 months was possible," though the Court explained that it would determine the sentence after it got the presentence report and other information.  Id. at 27:20-28:5.  The Court cautioned the petitioner that "whatever I sentence you, you ought to understand you can't change your plea once you give it to me, you have given it to me already.  Do you understand that?" Id. at 28:3-7.  The petitioner confirmed that he understood that he could not change his plea based on the Court's sentence.  Id.   The Court also warned the defendant about the potential immigration consequences facing the petitioner, explaining that "since you are a green card holder, you can be deported or, technically, what we say is be removed from the country."  Id. at 27:1-3; 8:22-25 (petitioner notifying the Court that he is not a citizen and instead a green card holder).

B.    The Petitioner Was Sentenced to a Below-Guidelines Sentence of Six Months' Home Detention and Three Years' Supervised Release

The defendant was sentenced on October 10, 2000.  Criminal Docket No. 98-721 (FB), ECF 72 (transcript).  At the outset of the proceeding, the Court calculated the applicable sentencing guidelines to be 10 to 16 months' imprisonment.  See id. at 5:4-7.  But the Court significantly "downwardly depart[ed]" and imposed a non-incarceratory sentence of six months' home confinement and three years' probation.  Id. at 12:10.  The Court explained that it did so because of a "combination of circumstances," including that the petitioner voluntarily returned to the United States from Syria to face trial, when he "knew that there were consequences that would flow from going to trial or not going to trial or being sentenced ultimately."  Id. at 12:9-20.  The petitioner did not file an appeal or seek any form of judicial relief for more than twenty-five years, until filing the instant Petition.

C.    The Petitioner's Immigration Proceedings

The petitioner is a citizen of the United Kingdom.  He claims he was granted conditional residency in the United States for a two-year period in May 1998—meaning that his conditional residency expired in or around May 2000.  ECF 1-2, at ¶ 10.  At that time, in May 2000, the petitioner submitted a Form I-751, Petition to Remove the Conditions on Residence, which is a form that conditional residents who obtained status through marriage use to request that U.S. Citizenship Immigration Services ("USCIS") remove the conditional aspects of their

3

residence.[1]  ECF 1-10.  On that form, the petitioner was asked:  Since becoming a conditional resident, have you ever been arrested, cited, charged, indicted, convicted, fined, or imprisoned for breaking or violating any law or ordinance (excluding traffic regulations), or committed any crime for which you were not arrested?  Id.  Despite having pleaded guilty to four federal felonies just five months earlier, the defendant answered "no."  Id.

The petitioner says that, after submitting his Form I-751, in February 2002, he had an adjustment of status interview with a USCIS officer to verify his eligibility for a green card. ECF 1-2, at ¶ 44.  The petitioner claims that he expected the result of that interview to be the receipt of a green card, but the green card never came.  Id.  Instead, there were "years of delays, cancelled appointments, and vague excused from the immigration authorities."  Id.  Then, on February 7, 2007, the petitioner was told that his "green card had been 'rescinded' years earlier," after which he was "given an appointment to return and receive notice of a court appearance for a removal hearing."  Id. at ¶ 45.  The petitioner claims that he "came back several times" thereafter but was "sent away because [h]is file" was unavailable."  Id.  Then, "at an April 26, 2011, appointment" he was served with a Notice to Appear in Removal Proceedings under Section 240 of the Immigration and Nationality Act ("NTA").[2]  Id. at ¶ 46.  Despite learning in 2007 that he was subject to a removal hearing, the petitioner claims that this was his "first notice of the mandatory deportation consequence" of his conviction.  Id.

As the NTA explains, the petitioner was subject to removal proceedings because he was "not in possession of a valid unexpired immigrant visa…or other valid entry document," and because (1) he made a materially false statement on his Form 1-751 when he stated he had never been arrested, cited, charged, indicted, convicted, fined, or imprisoned while a conditional resident, when in fact he had; and (2) of his convictions for the drug offenses in Criminal Docket No. 98-721 (FB).  ECF 1-10, at 3.  In particular, the NTA stated that, "On or about May 10, 2000, you sought to procure (or you procured) a visa, other documentation, or admission into the United States or other benefit provided under the Immigration and Nationality Act, by fraud or by willfully misrepresenting a material facet, to wit: on your Form I-751, Petition to Remove the Conditions on Residence (EAC 00 219 00009), in response to a question on Part 3 of the petition, which stated, []Since becoming a conditional resident, have you ever been arrested, cited, charged, indicted, convicted, fined, or imprisoned for breaking or violating any law or ordinance (excluding traffic regulations), or committed any crime for which you were not arrested?[], you answered []no[], when in fact, you were arrested on September 29, 1998 and subsequently convicted of various controlled substance related offenses on October 11, 2000."  Id.

The petitioner hired counsel and litigated his removal proceedings.  In a letter dated May 25, 2011, the petitioner's counsel advised him that making a materially false statement on his

---

[1]      In 1995, the petitioner married a United States citizen.  ECF 1-2, at ¶ 5.  That marriage ended in divorce in 2000.  Id. at ¶ 42.

[2]      The petitioner does not explain the significant gaps in his immigration timeline, such as what occurred between May 2000 and February 2002, February 2002 and February 2007, and February 2007 and April 2011.

4

Form I-751, as well as convictions for the drug offenses, made him "inadmissible to enter the United States." ECF 1-11. The May 25, 2011, letter claims that the petitioner "jump-start[ed] [the immigration] proceedings" to try to obtain status. Id.

According to the petitioner, on January 13, 2012, his attorneys filed a request to terminate his proceedings, which ICE denied. ECF 1-2, at ¶ 49. Instead, ICE agreed to administratively close his case because the petitioner was a low priority. Id. On March 6, 2013, the petitioner's immigration proceedings were "administratively closed upon the joint consent and motion" of the petitioner and the government. ECF 1-12. The administrative closure of his removal proceedings did not provide the petitioner with legal status, and since that closure, immigration authorities have been "free at any moment to resume [the petitioner's] deportation case." ECF 1-2, at ¶ 51.

D.    The Petitioner Applied for a Presidential Pardon in 2022

After his case was administratively closed, the petitioner claims it was not until 2021 when he again revisited the issue of his legal status. ECF 1-2, at ¶¶ 60-61. At that time, his father, who lives in Syria, became ill. Id. The petitioner says that the fact that he could not travel to see his ailing father was a "trigger" that caused him to "start looking for ways to fix [his] status." Id. Thereafter, the petitioner hired new legal counsel and applied for a presidential pardon on May 6, 2022. Id. at ¶ 62.

E.    The Instant Petition for Coram Nobis Relief

The petitioner filed his Petition on March 14, 2026, claiming for the first time that his trial counsel was ineffective for failing to advise him of the immigration consequences of pleading guilty to the crimes charged, though he admits that the Court warned him that he could be deported at his change of plea hearing. ECF 1-3, at 7; ECF 1-2, at ¶ 37. Specifically, the petitioner claims that his trial counsel "explicitly told [him] that if [he] did not receive a prison sentence of a year or more" he would be "fine and would not be deported," and that he "relied entirely on this specific formula" in pleading guilty. ECF 1-2, at ¶ 29. Puzzlingly, the petitioner also claims that he was forced to plead guilty because he did not have the money to pay his attorney to go to trial, and his counsel refused to go to trial without additional funds. Id. at ¶ 34. The petitioner also claims, without evidence, that his trial counsel provided him with incorrect advice because she wanted to protect his co-defendant's interests instead of his, supposedly because his co-defendant paid her initial $10,000 retainer. Id. at ¶ 19; ECF 1-3, at 15.

The petitioner argues that he only learned of the immigration consequences of his plea in 2011, when he was served with the NTA. ECF 1-2, at ¶ 46. He claims he did not, however, file a coram nobis petition because his immigration counsel had advised him that filing the petition could result in his removal proceedings being re-calendared. Id. at ¶ 51. The petitioner then argues that, upon learning that, he did "not sleep on his rights," because—a decade later—he filed an application for a Presidential Pardon in 2022. ECF 1-3, at 12. Finally, the petitioner argues that his March 2026 filing is timely because it was filed after a "recent 'triggering event'"—namely,

5

the issuance of Policy Memorandum 25-29 in April 2025 by the Executive Office for Immigration Review (the "2025 Policy Memorandum"). Id. at 13; see also Exhibit A.[3]

Finally, with respect to his Form 1-751, the petitioner claims that he only made a materially false statement on that form because his then-immigration counsel advised him that he could answer the question of whether he had ever been arrested, cited, charged, indicted, convicted or fined with "no," because he had not yet been sentenced in the criminal matter. ECF 1-2, at ¶ 43.

## II.      Legal Standard

The writ of error coram nobis is a limited and exceptional remedy. See Nicks v. United States, 955 F.2d 161, 166-67 (2d Cir. 1992). As an "extraordinary remedy," it is designed to redress only "fundamental error." United States v. Denedo, 556 U.S. 904, 911 (2009). "[R]elief under the writ is strictly limited to those cases in which errors . . . of the most fundamental character have rendered the proceeding itself irregular and invalid." Foont v. United States, 93 F.3d 76, 78 (2d Cir. 1996) (internal quotation marks and citations omitted). As the Supreme Court has stated, "it is difficult to conceive of a situation in a federal criminal case today where [a writ of *coram nobis*] would be necessary or appropriate." Carlisle v. United States, 517 U.S. 416, 429 (1996) (cleaned up); see also United States v. George, 676 F.3d 249, 251 (1st Cir. 2012) (likening coram nobis to a "Hail Mary pass in American football").

Consistent with these principles, the Second Circuit has articulated a three-part test that a petitioner must satisfy to be entitled to coram nobis relief: "1) there are circumstances compelling such action to achieve justice; 2) sound reasons exist for failure to seek appropriate earlier relief; and 3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ." Foont, 93 F.3d at 79 (cleaned up). It is the petitioner's burden to prove each of the three parts to be entitled to relief. United States v. Morgan, 346 U.S. 502, 512 (1954). The petitioner's burden is a heavy one, since the court must start its analysis presuming "that the proceedings were correct." United States v. Mandanici, 205 F.3d 519, 524 (2d Cir. 2000).

Moreover, timeliness of a coram nobis petition is a "threshold procedural hurdle" for relief. Dixon v. United States, No. 24-CV-4312 (LAP), 2024 WL 3413735, at *2 (S.D.N.Y. Jul. 15, 2024); see Lazreg v. United States, No. 09-CR-00399 (NGG), 2019 WL 3412109, at *2 (E.D.N.Y. July 26, 2019) ("timeliness . . . is a procedural hurdle to obtain relief"). Though coram nobis has no statute of limitations, relief "may be barred by the passage of time." Foont, 93 F.3d

---

[3]        The 2025 Policy Memorandum rescinded and canceled a prior memorandum that provided guidance to adjudicators on administrative closures. The 2025 Policy Memorandum observed that a prior regulation on docket management rendered the earlier memorandum rescinded. It also stated that The Executive Office for Immigration Review ("EOIR") would not defend the regulation at issue if challenged in court. Nowhere does the 2025 Policy Memorandum say that EOIR was re-opening all cases that were previously administratively closed.

6

at 79. "[T]he longer the delay, the more compelling must be the reasons." Tocci v. United States, 178 F. Supp. 2d 176, 181 (N.D.N.Y. 2001).

III.    Argument

A.    The Petition is Untimely

As an initial matter, the Petition should be denied because the petitioner waited over *twenty-six years* since his conviction to file this petition. The petitioner claims that it was not until 2011 that he first learned that his conviction would result in his potential removal, when he was served with a notice to appear in removal proceedings.[4] ECF 1-3, at 12. Those removal proceedings were then administratively closed in 2013. ECF 1-12. Even assuming arguendo that petitioner only learned of the immigration consequences of his plea in 2011 (as explained infra, he did not), petitioner still waited *fifteen* years since that time to file his Petition. This Court has rejected coram nobis petitions for delays significantly shorter than petitioner's here. See Lazreg, 2019 WL 3412109, at *3 (finding two-and-a-half-year delay unjustifiable "particularly given the fact that petitioner…did not file his petition until discovering that Immigration and Naturalization Service [] denied his application to be a naturalized citizen"); Ejekwu v. United States, No. 02 CV 699 (SJ), 2005 WL 3050286, at *3 (E.D.N.Y. Nov. 14, 2005) (denying writ where petitioner filed more than two years after the I.N.S. denied his naturalization application and five years after he completed his supervised release); Echendu v. United States, No. CV–02–1255 (DGT), 2003 WL 21653370, at *6 (E.D.N.Y. July 14, 2003) (same where petitioner waited well over five years after passage of immigration reform act).

The petitioner offers several excuses for his inaction. First, he claims he did not attempt to challenge his conviction because he was advised by separate immigration attorneys that such an action could cause his immigration proceedings, which were administratively closed in 2013, to be opened again. ECF 1-3, at 12. Second, he says he pursued alternative remedies for relief, such as a presidential pardon in 2022 (which itself was eleven years after he supposedly first learned of the problem). Id. Third, the petitioner argues that he acted "promptly" in pursuing this relief as soon as he was made aware of a recent "triggering event"—namely, the 2025 Policy Memorandum. Id. at 13.

None of these addresses the fundamental timeliness issue plaguing the Petition: that the petitioner became aware of the so-called error with his 2000 plea—that he was, in fact, subject to deportation—by, at the latest, 2011, and chose not to pursue coram nobis relief until 2026. The petitioner *deliberately* chose to wait until now to seek relief. And he did so for strategic reasons, choosing to prioritize other forms of relief he believed would be more likely to achieve his ultimate goal—a change in his immigration status. ECF 1-3, at 12 (petitioner describing his decision not to pursue relief in 2011 as "a calculated, prudent adherence to legal advice"); see id. (petitioner explaining that he did not "sleep on his rights" but instead chose to pursue a presidential pardon). A strategic decision to prioritize other avenues of relief does not justify an untimely

---

[4]    Puzzlingly, in his affidavit, the petitioner claims that he only learned of the consequences of his plea in 2011, yet he also states that he learned in 2007 that his green card had been rescinded and that he would be subject to a removal proceeding. ECF 1-2, at ¶ 45.

petition.  See Korac v. United States, No. 93-CR-848 (CS), 2011 WL 2365811, at *4 (S.D.N.Y. June 6, 2011) ("But where a petitioner has learned that a conviction carries possible immigration consequences and nevertheless waits to seek *coram nobis* relief for a period of several years, or until he has exhausted other means of attacking the conviction, no sound reason exists."); Durrani v. United States, 294 F. Supp. 2d 204, 214 (D. Conn. 2003) (rejecting petitioner's petition as untimely where petitioner claimed that he did not file for relief earlier because he wanted to "conserve limited personal and judicial resources" by resolving his immigration proceedings prior to seeking coram nobis relief).

The 2025 Policy Memorandum was not a "triggering" event that justifies the late Petition.  It did not provide the petitioner with any new facts concerning the supposed error in his 2000 plea.  In fact, the petitioner admits that he understood in 2013 that his administratively dismissed case could be re-calendared at any time, resulting in his "immediate removal."[5]  ECF 1-2, at ¶ 51; cf. Tavera v. United States, No. 20-CV-6342 (WFK), 2021 WL 2453940, at *3 (E.D.N.Y. June 16, 2021) (Supreme Court decision invalidating specific statute petitioner was charged under as unconstitutionally vague was triggering event for coram nobis relief).  What's more, the petitioner inexplicably waited nearly an entire year since the 2025 Policy Memorandum was released to seek relief.

At bottom, the petitioner knew in 2011, at the latest, that his conviction made him subject to deportation, making his failure to act until now unjustified.  Evangelista v. United States, No. CV 11-5085, 2012 WL 3818109, at *4 (E.D.N.Y. Sept. 4, 2012), aff'd, 523 F. App'x 12 (2d Cir. 2013) (finding petition was untimely where petitioner knew he faced deportation proceedings since 1999 and filed in 2009, "ten years after the institution of deportation proceedings"); Angus v. United States, No. 17-CV-583 (KAM), 2020 WL 3843728, at *6 (E.D.N.Y. July 8, 2020) ("The court agrees with the government that Mr. Angus either knew or should have known of the facts underlying his current claim by August 1991, when he was served with an I-221 Order to Show Cause, and charged with being subject to deportation…") (cleaned up); Sahin v. United States, No. 8:13-CV-358 (GLS/RFT), 2014 WL 2177088, at *7 (N.D.N.Y. May 22, 2014) (dismissing petition for unjustifiable delay where petitioner knew a deportation order was issued and could be acted upon but the government waited several years to act on it, explaining that petitioner's "false sense of security in remaining in the United States due to a passing of time without government action does not, in any way, excuse his failure to pursue avenues of relief that may have been available to him, including bringing a writ of error *coram nobis*").

B.      Granting Coram Nobis Relief Would Not Achieve Justice

The Petition also fails because petitioner cannot demonstrate that granting coram nobis relief would achieve justice.  The crux of petitioner's argument is that his guilty plea was involuntary because it was induced by ineffective assistance of counsel—specifically, the inaccurate advice that his attorney supposedly gave that "avoiding a prison sentence of one year

---

[5]      To the extent petitioner claims that the 2025 Policy Memorandum orders the opening of previously closed cases, the Memorandum says no such thing.

or more would immunize him from deportation." ECR 1-3, at 14. The petitioner's claim fails as a matter of fact and law.

Ineffective assistance of counsel requires that (1) counsel's performance "fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). "Judicial scrutiny of counsel's performance must be highly deferential" and the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.

The petitioner's claim fails because the record makes clear that he was, in fact, advised of the immigration consequences of his conviction at the time he pleaded guilty—when the Court informed him that "since you are a green card holder, you can be deported or, technically, what we say is be removed from the country." Criminal Docket No. 98-721 (FB), ECF 71 (transcript), at 27:1-3; 8:22-25 (petitioner notifying the Court that he is not a citizen and instead a green card holder). The petitioner also confirmed his plea was voluntary, and that he was not forced by anyone to take it nor promised any particular sentence for taking it. Id. at 20:18-21:1. Under these circumstances, there is "ample evidence that [the petitioner] was in fact informed of the risk." See Ewan v. United States, No. 11-CV-06254 (FB), 2012 WL 3646741, at *2-*3 (E.D.N.Y. Aug. 23, 2012) (rejecting claim where counsel allegedly falsely represented that conviction had no immigration consequences and guaranteed petitioner would not be deported where, among other things, petitioner was advised of immigration consequences by the Court during the plea proceeding); Cisse v. United States, 330 F. Supp. 2d 336, 341-42 (S.D.N.Y. 2004) (rejecting petitioner's argument that he was not properly advised of the immigration consequences of his plea where "the Court advised the petitioner of the immigration consequences of his plea and it is plain that the petitioner understood," explaining that "sworn statements in open court…carry a strong presumption of verity that cannot be overcome by conclusory allegations"); Foreman v. United States, 247 Fed. Appx. 246, 248 (2d Cir. 2007) (finding claim that counsel "failed to advise him of the consequences of his guilty plea with respect to [petitioner's] immigration status…without merit" because the record indicated that counsel and petitioner did discuss the impact of the plea on immigration status).

The petitioner claims that the Court's warning did not cure counsel's deficiency because he "filtered that statement through the erroneous framework his counsel had just provided him." ECF 1-3, at 14. But the record undercuts the reasonableness of petitioner's claim. During the plea hearing, the Court advised petitioner that the statutory maximum for each of the counts to which he was pleading was five years, and that, while his official guidelines range would need to be calculated once the pre-sentence report came back, "it is estimated that a range of imprisonment from 18 to 24 months was possible" based on a previous plea agreement. Criminal Docket No. 98-721 (FB), ECF 71 (transcript), at 26:16-25, 27:6-7, 27:20-28:3. Thus, even if the petitioner relied on his counsel's advice that "as long as his sentence was not for 'a year or more' in prison, he 'would be fine' and not be deported," the record is clear that, at the time he pleaded guilty, he was advised by the Court that he was facing much more than that—and yet he still chose to plead.[6]

---

[6]     In fact, the ultimate sentence imposed upon the petitioner of six months' home confinement and three years' probation was a significant downward departure from his ultimate

9

"[A] defendant's mistaken subjective impressions gained from conferences with his legal counsel, in the absence of substantial objective proof showing that they were reasonably justified, do not provide sufficient grounds to set aside his guilty plea." Lazreg, 2019 WL 3412109, at *3 (cleaned up).

There is also no reasonable basis to conclude that, but for counsel's alleged mis-advice, petitioner would have gone to trial or "negotiated a plea that did not mandate deportation." ECF 1-3, at 15-16. Petitioner does not put forth "substantial and uncontroverted evidence" that, had he been properly advised of the immigration consequences of pleading guilty, he would have chosen to go to trial. Lee v. United States, 582 U.S. 357, 371 (2017); id. at 369 (instructing that "[c]ourts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies" and "should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences").

Unlike in Lee v. United States, where the defendant stated on the record at the time of his plea that the immigration consequences affected his decision about whether to plead or not, see 582 U.S. at 369, here, the record makes clear that petitioner ultimately *chose* to plead guilty because he wanted to avoid the emotional and financial costs of trial, as well as earn entitlement to acceptance of responsibility points. Criminal Docket No. 98-721 (FB), ECF 71 (transcript), at 18:10-22 (THE COURT: …[Y]ou wish to plead to the indictment as charged is because you do not want to go through the emotional upheaval of the trial or the expense of a trial. You believe you are guilty and you want to avail yourself some consideration under our sentencing guidelines for accepting responsibility, so that your sentence would be less than it arguably would otherwise be if you were found guilty. Does that fairly express your intentions and desires? THE DEFENDANT: Yes, your Honor.). The petitioner also did not "wish your Honor to have to sit at a trial in which he himself admits that he's done wrong." Id. at 4:8-10.

Moreover, in Lee, both the petitioner and his trial counsel testified at an evidentiary hearing that (1) petitioner was provided with the wrong advice about the immigration consequences of pleading guilty; and (2) had he understood the consequences, he would have gone to trial, whereas here, there is nothing in the record concerning petitioner's immigration concerns besides petitioner's conclusory statements about his intent, which, as described above, are entirely contradicted by the record. 582 U.S. at 362, 367; See also Alamgir v. United States, No. 20-CV-215 (MKB), 2023 WL 5806234, at *9 (E.D.N.Y. Sept. 7, 2023) (record did not indicate that petitioner put a "particular emphasis on immigration consequences" when pleading guilty where petitioner "affirmed his intent to plead guilty" after the Court informed him of immigration consequences) (cleaned up). What's more, petitioner admitted, and continues to admit, that he is guilty of the crimes charged, see, e.g., ECF 1-2, at ¶¶ 11-14, and has put forth no viable defenses he could have raised to the charged-conduct. Lee, 582 U.S. at 367 ("[A] defendant facing such long odds will rarely be able to show prejudice from accepting a guilty plea that offers him a better resolution than would be likely after trial.").

---

guidelines range, which were 10 to 16 months imprisonment. Criminal Docket No. 98-721 (FB), ECF 72 (transcript), at 5:4-7, 12:17-20, and 13:6-13.

Similarly, petitioner's claim that any "constitutionally effective attorney" could have gotten the defendant a better plea is purely speculative and also belied by the record. ECF 1-3, at 16. The record is clear that petitioner pleaded guilty on the "veritable eve of trial." Criminal Docket No. 98-721 (FB), ECF 71 (transcript), at 4:12. Given those circumstances, it is highly unlikely that any counsel could have negotiated a plea agreement to entirely new charges that did not pose any immigration consequences. Angus, 2020 WL 3843728, at *5 (petitioner's assertion that counsel "could have negotiated a plea to the crime with no effect on [petitioner's] immigration status" was "speculative" because there was no evidence the government would have offered petitioner a plea that "shielded petitioner from immigration consequences resulting from aggravated felony convictions"); cf. Kovacs v. United States, 744 F.3d 44, 52-53 (2d Cir. 2014) (petitioner sustained the "very considerable burden of establishing" that there was a "reasonable probability that the prosecution would have accepted, and the court would have approved, a deal that had no adverse effect on the petitioner's immigration status" where transcript from plea hearing showed that petitioner's "single-minded focus in the plea negotiations was the risk of immigration consequences" and petitioner's lawyer submitted a declaration stating that the charge to which petitioner pleaded guilty upon "was settled on in the plea negotiation for the sole reason that [the lawyer] believed it would not impair [petitioner's] immigration status," which fact petitioner's lawyer conveyed to the prosecution).

Finally, petitioner argues that his lawyer had a "*modus operandi* of fraud" which led her to "actively misle[a]d him to expedite a plea and protect her primary benefactor," his co-defendant, at the "expense of" petitioner. ECF 1-3, at 15. Petitioner points to the fact that his co-defendant paid his counsel's initial retainer, ECF 1-2, at ¶ 19, and that his counsel was later indicted for fraud in an entirely unrelated matter. ECF 1-3, at 15. But petitioner does not allege any connection between these facts and what he claims—for example, why it would benefit his co-defendant for him to plead guilty, or how his counsel's separate legal troubles show that she likely misadvised defendant-petitioner. Indeed, the record shows that his co-defendant was already sentenced by the time petitioner was. Criminal Docket No. 98-721 (FB), ECF 72 (transcript), at 11:1-12. "Petitioner's conclusory assertions are insufficient to justify *coram nobis* relief." Angus, 2020 WL 3843728, at *4.

C.    Petitioner Fails to Allege Ongoing Harm to be Remedied

The petition should also be denied because the petitioner has not shown he suffers continuing legal consequences due to his conviction.

As petitioner's NTA states, the petitioner is subject to removal because of the fact that he made a materially false statement on his Form I-751 application, not just because of his conviction in this underlying matter. ECF 1-10; see also ECF 1-11 (counseling defendant-petitioner that his "statement about your drug case on the application you filed in 2000 presents a "similar problem" to the conviction itself, making defendant-petitioner "inadmissible to enter the United States and ineligible to apply for any relief from inadmissibility"). Thus, issuing the writ of coram nobis would not "remedy that consequence" because the false statements on his I-751 form would still exist as a basis to remove the petitioner. Foreman, 247 Fed. Appx. at 248 (writ would not prevent deportation where order of removal "would still be valid based on" other conviction); Korac, 2011 WL 2365811, at *4 (same).

11

In any event, the threat of deportation is not, as the petitioner claims, an "imminent certainty." See, e.g., ECF 1-3 at 5. The 2025 Policy Memorandum does not order the opening of previously closed cases, and in the year since the 2025 Policy Memorandum was released, the petitioner does not claim to have received any notice that his immigration proceedings have been re-opened and calendared. Under these circumstances, the threat of deportation is speculative and does not warrant relief. Cf. Ewan, 2012 WL 3646741, at *1-2 (finding concrete harm where the petitioner had in fact been placed in immigration proceedings but denying relief on other grounds); Ejekwu, 2005 WL 3050286, at *2 (finding that an unsuccessful naturalization application and "supposed eligibility for removal" does not demonstrate a "present and substantial legal disability" warranting coram nobis relief).

Finally, while the government acknowledges that the petitioner cannot readily travel abroad to visit family or accept assignments that require working abroad, the Petition makes clear that petitioner has been meaningfully employed since his conviction, rendering any ongoing harm caused by his conviction "clearly a collateral consequence of a conviction, but…not [a] *legal consequence* of the type specified by the Second Circuit as a prerequisite to eligibility for coram nobis relief." Dixon v. United States, No. 14-CV-960 KMK, 2015 WL 851794, at *12 (S.D.N.Y. Feb. 27, 2015) (emphasis in original) (cleaned up); see id. ("The mere inability to obtain certain jobs, as compared to being barred from one's chosen line of work, does not constitute continuing legal harm.").

IV.     Conclusion

For the reasons set forth above, the Petition should be denied.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:     /s/  Alessandra V. Rafalson
        Alessandra V. Rafalson
        Assistant U.S. Attorney
        (718) 254-6016

c.c.    Clerk of Court (FB) (by ECF & E-Mail)
        Counsel of Record (by ECF & E-Mail)

12