# Exhibit A



OOD
PM 25-29
Effective: April 18, 2025

To:    All of EOIR
From:  Sirce E. Owen, Acting Director
Date:  April 18, 2025

SIRCE OWEN    Digitally signed by SIRCE OWEN Date: 2025.04.18 14:12:38 -04'00'

## CANCELLATION OF DIRECTOR'S MEMORANDUM 22-03

| | |
|---|---|
| PURPOSE: | Rescind and Cancel Director's Memorandum 22-03 |
| OWNER: | Office of the Director |
| AUTHORITY: | 8 C.F.R. § 1003.0(b) |
| CANCELLATION: | Director's Memorandum 22-03 |

### I.    Introduction

On November 22, 2021, the EOIR Director issued Director's Memorandum (DM) 22-03, *Administrative Closure*, purporting to provide guidance regarding the use of administrative closure by EOIR adjudicators. A subsequent rulemaking superseded that DM, *see* Efficient Case and Docket Management in Immigration Proceedings, 89 FR 46742 (May 29, 2024) (ECDM Rule), and rendered it unnecessary. Furthermore, many of the assertions in that DM were either factually or legally dubious, and EOIR cannot defend it as a policy. Consequently, it warrants rescission and cancellation.

### II.    History of EOIR's Use of Administrative Closure

No statute authorizes administrative closure by EOIR adjudicators, and prior to the ECDM Rule, no regulation clearly authorized it either. EOIR's use of administrative closure in immigration proceedings dates back to at least the 1970s, as EOIR still has unresolved cases that were administratively closed during that decade. The use of administrative closure became more widespread in the 1980s following the issuance of an Operating Policies and Procedures Memorandum ("OPPM") in 1984 setting forth options available to Immigration Judges in cases where aliens failed to appear for their hearings, including the option to administratively close cases. OPPM 84-2: *Cases in Which Respondents/Applicants Fail to Appear for Hearing* (Mar. 7, 1984) (rescinded). Notably, that OPPM did not identify any basis for its authority, and there was no delegation by the Attorney General of such authority.

Subsequently, the use of administrative closure generally tended to correspond with either legislative changes providing new statutory forms of relief for aliens or with federal court settlement agreements requiring its use. For example, in 1986, shortly after the passage of the Immigration Reform and Control Act of 1986, creating an amnesty program for certain illegal

1

aliens who had entered the United States prior to January 1, 1982, Immigration Judges increasingly used administrative closure to pause removal proceedings while aliens pursued this newly available amnesty.  PL 99-603, 100 Stat. 3359 (November 6, 1986).

Likewise, in the 1990s and early 2000s, the Department entered into binding settlement agreements that required Immigration Judges and the Board of Immigration Appeals ("Board") to administratively close cases and issued regulations providing that parties could request administrative closure in a variety of specified situations.[1]

As the use of administrative closure became more common, the Board began to address questions related to its use.  For example, in 1988, the Board determined that an Immigration Judge improperly exercised administrative closure authority rather than hold deportation proceedings *in absentia*.  *Matter of Amico*, 19 I&N Dec. 652, 654 (BIA 1988).  Likewise, in 1990, the Board published *Matter of Lopez-Barrios* and *Matter of Munoz-Santos*, both of which held that an Immigration Judge could not administratively close a case if either party to the proceedings opposed closure.  *Matter of Lopez-Barrios*, 20 I&N Dec. 203 (BIA 1990); *Matter of Munoz-Santos*, 20 I&N Dec. 205 (BIA 1990).

These decisions were consistent with prior Board caselaw—and general principles of administrative separation-of-functions—holding that decisions on whether to prosecute immigration proceedings were the sole province of the then-Immigration and Naturalization Service ("INS") (now the Department of Homeland Security ("DHS")).  *See, e.g.*, *Matter of Quintero*, 18 I&N Dec. 348, 350 (BIA 1982), *aff'd sub nom. Quintero-Martinez v. INS*, 745 F.2d

---

[1] *See, e.g.*, *Barahona-Gomez v. Ashcroft*, 243 F. Supp. 2d 1029, 1035 (N.D. Cal. 2002) ("[I]f the [Respondent] fails to appear for the scheduled hearing . . . the case shall be administratively closed, following which, should the Respondent come forward, the hearing shall be recalendared[.]"); *Am. Baptist Churches v. Thornburgh,* 760 F. Supp. 796, 805-806 (N.D. Cal. 1991) ("*ABC*") (ordering that proceedings before EOIR be administratively closed, generally, for class members); Adjustment of Status for Certain Nationals of Nicaragua and Cuba, 63 FR 27823, 27830 (May 21, 1998) (implementing administrative closure procedures for aliens who appeared eligible to adjust status under the Nicaraguan Adjustment and Central American Relief Act of 1997 ("NACARA")), 8 C.F.R. § 245.13(d)(3) (1999); Adjustment of Status for Certain Nationals of Haiti, 64 FR 25756, 25771 (May 12, 1999) (requiring Immigration Judges and the Board to exercise administrative closure in cases where aliens appeared to be eligible to file an application for adjustment of status under the Haitian Refugee Immigration Fairness Act of 1998 ("HRIFA") and met various other requirements), 8 C.F.R. § 245.15(p)(4) (2000); Executive Office for Immigration Review; Adjustment of Status for Certain Nationals of Nicaragua, Cuba, and Haiti, 66 FR 29449, 29452 (May 31, 2001) (providing that an alien for whose case an Immigration Judge or the Board has granted a motion to reopen under particular statutes may move to have proceedings administratively closed to seek adjustment of status), 8 C.F.R. § 245.13(m)(1)(ii) (2002); V Nonimmigrant Classification; Spouses and Children of Lawful Permanent Residents, 66 FR 46697, 46704 (Sept. 7, 2001) ("If the alien appears eligible for V nonimmigrant status, the immigration judge or the Board, whichever has jurisdiction, shall administratively close the proceeding or continue the motion indefinitely."), 8 C.F.R. § 214.15(l) (2002); New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status, 67 FR 4784, 4797 (Jan. 31, 2002) (stating that T-visa applicants may request administrative closure) (codifying language later moved to 8 C.F.R. § 1214.2(a)); Adjustment of Status for Certain Aliens from Vietnam, Cambodia, and Laos in the United States, 67 FR 78667, 78673 (Dec. 26, 2002) (authorizing certain nationals of Vietnam, Cambodia, and Laos to move for administrative closure pending their applications for adjustment of status, but preventing the Immigration Judge or the Board from "defer[ring] or dismiss[ing] the proceeding" without the former INS's consent) (codifying language later moved to 8 C.F.R. § 1245.21(c)). As discussed, *infra*, some of these regulations may be *ultra vires* or otherwise unlawful for other reasons, but a further discussion of these specific regulations is beyond the scope of this PM.

67 (9th Cir. 1984) (noting that an Immigration Judge "may neither terminate nor indefinitely adjourn the proceedings in order to delay an alien's deportation . . . [and] [o]nce deportation proceedings have been initiated by [DHS], the immigration judge may not review the wisdom of [DHS's] action, but must execute his duty to determine whether the deportation charge is sustained by the requisite evidence in an expeditious manner"); *see also Matter of Roussis*, 18 I&N Dec. 256, 258 (BIA 1982) ("It has long been held that when enforcement officials of the [DHS] choose to initiate proceedings against an alien and to prosecute those proceedings to a conclusion, the immigration judge is obligated to order deportation if the evidence supports a finding of deportability on the ground charged."); *cf. Lopez-Telles v. INS*, 564 F.2d 1302, 1304 (9th Cir. 1977) ("Rather, these decisions plainly hold that the immigration judge is without discretionary authority to terminate deportation proceedings so long as enforcement officials of the [DHS] choose to initiate proceedings against a deportable alien and prosecute those proceedings to a conclusion. The immigration judge is not empowered to review the wisdom of the [DHS] in instituting the proceedings. His powers are sharply limited, usually to the determination of whether grounds for deportation charges are sustained by the requisite evidence or whether there has been abuse by the [DHS] in its exercise of particular discretionary powers. This division between the functions of the immigration judge and those of [DHS] enforcement officials is quite plausible and has been undeviatingly adhered to by the [DHS]."); *Matter of Silva-Rodriguez*, 20 I&N Dec. 448, 449-50 (BIA 1992) (undue delay by an Immigration judge may frustrate or circumvent statutory purpose of prompt immigration proceedings); *Matter of Yazdani*, 17 I&N Dec. 626, 630 (BIA 1991) ("However, so long as the enforcement officials of the [DHS] choose to initiate proceedings against an alien and to prosecute those proceedings to a conclusion, the immigration judge and the Board must order deportation if the evidence supports a finding of deportability on the ground charged."). Otherwise, an Immigration Judge could, through the unilateral use of administrative closure, overrule DHS's decision on prosecuting a particular case and indefinitely adjourn the case to effectively prohibit or avoid the alien's removal.

The prohibition on administrative closure over the opposition of a party generally remained the status quo for several years. However, in 2012, the Board published *Matter of Avetisyan*, 25 I&N Dec. 688 (BIA 2012), which caused significant upheaval in the law and accelerated the utilization of administrative closure. In that decision, the Board held, for the first time ever, that Immigration Judges and the Board could unilaterally administratively close proceedings over a party's objection. *Id.* at 694. This broad interpretation was a significant—and partially unexplained— departure from the prior uses of administrative closure described above. Further—and also for the first time ever—the Board linked Immigration Judges' and Appellate Immigration Judges' authority to administratively close proceedings to general regulatory authority provisions under 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii) to take any appropriate and necessary action. *Id.* at 691.

Notably, the Board in *Matter of Avetisyan* did not expressly overrule—or even acknowledge—its prior line of cases prohibiting Immigration Judges and Appellate Immigration Judges from second-guessing DHS's decisions to prosecute a case in removal proceedings. Rather, it simply asserted a *non sequitur*—that its decision would not preclude DHS from pursuing removal proceedings, despite the fact that unilateral administrative closure over DHS's objection does preclude DHS

3

from pursuing the removal proceedings while the administrative closure order is in effect, *compare Matter of Avetisyan*, 25 I&N Dec. at 694 ("Although administrative closure impacts the course removal proceedings may take, it does not preclude the DHS from . . . pursuing those proceedings . . . ."), *with Matter of Amico*, 19 I&N Dec. at 654 ("When a case is administratively closed, the respondent is allowed . . . to avoid an order regarding his deportability, and the consequences an order of deportation could bring.") *and Matter of Quintero*, 18 I&N Dec. at 350 (noting that an Immigration Judge "may neither terminate nor indefinitely adjourn the proceedings in order to delay an alien's deportation . . . [and] [o]nce deportation proceedings have been initiated by [DHS], the immigration judge may not review the wisdom of [DHS's] action, but must execute his duty to determine whether the deportation charge is sustained by the requisite evidence in an expeditious manner")—without justification, explanation, or even an acknowledgment of its prior caselaw to the contrary.[2]

Furthermore, *Matter of Avetisyan* did not address that the regulatory provisions only assign the authority to defer adjudication of cases to the Director, the Chief Appellate Immigration Judge, and the Chief Immigration Judge—but not to Immigration Judges or Appellate Immigration Judges themselves. *See* 8 C.F.R. §§ 1003.0(b)(1)(ii), 1003.1(a)(2)(i)(C), 1003.9(b)(3). Further, the Board did not acknowledge that, if 8 C.F.R. §§ 1003.1(d)(1)(ii) and 1003.10(b) provided freestanding authority for administrative closures, then other regulatory provisions that do expressly provide for such closures would be superfluous. *See, e.g.*, 8 C.F.R. § 1245.13(d)(3)(i) (stating that immigration judges or the Board "shall, upon request of the alien and with the concurrence of [DHS], administratively close the proceedings"). Finally, the Board did not address the reference in 8 C.F.R. §§ 1003.1(d)(1)(ii) and 1003.10(b) to the "disposition" of cases, which ordinarily connotes a final or dispositive decision, which an order of administrative closure is certainly not. *Compare* Black's Law Dictionary (11th ed. 2019) (defining "disposition" as "[a] *final* settlement or determination" (emphasis added)), *with Matter of Avetisyan*, 25 I&N Dec. at 695 (describing the "fact that administrative closure does not result in a final order" as "undisputed") *and Matter of Amico*, 19 I&N Dec. at 654 n.1 ("The administrative closing of a case does not result in a final order.").

The result from *Matter of Avetisyan* was a dramatic increase in the use of administrative closure, which was encouraged by the Department of Justice and EOIR leadership in an apparent effort to effectuate a policy goal of avoiding or deferring orders of removal against as many aliens as possible. Between Fiscal Year (FY) 1991 and the close of FY 2011, the FY preceding the *Matter of Avetisyan* decision, EOIR averaged 3,697 cases of administrative closure per FY. However, in

---

[2] The Board's change in position in *Matter of Avetisyan* was neither well-reasoned nor observant regarding prior Board precedent with which it conflicted. Indeed, *Matter of Avetisyan* failed to fully explain its change in position from prior Board precedents prohibiting Immigration Judges from preventing DHS from prosecuting its cases itself, nor did it even acknowledge there was a change. This unexplained and unacknowledged departure from prior precedent violates fundamental principles of administrative law. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."). Thus, although *Matter of Avetisyan* remains precedential and binding, EOIR cannot—and will not—defend it in good faith if challenged in litigation because it provided neither a reasoned explanation nor awareness of its marked change in position from past precedent regarding DHS's prosecutorial discretion.

the five FYs following FY 2012, EOIR averaged 21,158 administratively closed cases per FY. This pattern repeated after *Matter of Avetisyan* was revived in 2021.[3]  Between FY 2022 and FY 2024, EOIR averaged 33,209 cases of administrative closure per FY.  Of the approximately 379,000 cases that are still administratively closed at the immigration court level (since FY 1974), as of the beginning of April 2025, over 222,000 were administratively closed in just nine FYs: FY 2013 to FY 2017 and FY 2022 to FY 2025.

### III.    Inaccurate Characterizations of Administrative Closure

EOIR's increased utilization of administrative closure as a policy-driven tool since 2011 also corresponded with repeated—yet demonstrably untrue—assertions about its usage.  These knowing mischaracterizations of administrative closure, particularly by those with access to accurate information, warrant significant rectification.

For example, administrative closure has often been described as a temporary measure.  *See*, *e.g.*, *Matter of Gutierrez-Lopez*, 21 I&N Dec. 479, 480 (BIA 1996) ("Administrative closure of a case is used to temporarily remove a case from an Immigration Judge's calendar or from the Board's docket."), *overruled by Matter of Avetisyan*, 25 I&N Dec. at 697.  Although that may have been arguably true in the 1980s or 1990s, it is no longer considered a temporary measure.  On the contrary, the average length of time that a case is administratively closed at the immigration court level is approximately 15 years, and approximately 29 years at the Board level.  These averages do not reflect "temporary" action by any reasonable definition of the term.  Rather, administrative closure is more properly characterized as an indeterminate or unbounded measure, which typically stops an adjudication indefinitely.

Second, administrative closure is often erroneously alleged to aid docket management and has been described as an "administrative convenience," *Matter of Amico*, 19 I&N Dec. at 654 n.1.  Yet, periods of increased usage of administrative closure have also corresponded to periods of significant increases to EOIR's backlog.  For instance, between January 2013 and January 2017, the number of administratively closed cases increased from nearly 172,000 to over 268,000; over that same time period, EOIR's backlog increased from just under 550,000 cases to nearly 859,000.  Similarly, between January 2021 and January 2025, the number of administratively closed cases increased from nearly 278,000 to almost 392,000; over that same time period, EOIR's backlog increased from approximately 1.68 million cases to over 4.1 million cases.  Indeed, EOIR's experience shows that increased usage of administrative closure leads to greater lost-docket time as parties debate whether it is appropriate in a particular case, leading to even more continuances while that issue is resolved, and, if administrative closure is not ordered, a lengthy delay occurs in adjudicating the merits of a case that otherwise would have been decided much earlier.  Moreover, as a matter of logic, because administrative closure does not dispose of a case, it cannot help manage the overall docket; rather, it simply delays a case indefinitely without a disposition so that it remains in a liminal state.  Administrative closure merely "kicks the can down the road," increasing the overall backlog while leaving ripple effects—*e.g.* multiple continuances and lost

---

[3] *Matter of Avetisyan* was overruled in 2018 by the Attorney General. *Matter of Castro-Tum*, 27 I&N Dec. 271 (A.G. 2018).  *Matter of Castro-Tum* was, in turn, overruled by a different Attorney General in 2021, and *Matter of Avetisyan* was effectively reinstated. *Matter of Cruz-Valdez*, 28 I&N Dec. 326 (A.G. 2021).

adjudication time—in its wake, which further exacerbate the backlog.  In short, there is no reliable evidence that administrative closure aids docket management; rather, the opposite has shown to be true.

Similarly, as noted above, although administrative closure has been frequently characterized as a docket management tool, in reality, it has transformed into a mechanism to effectuate immigration policy goals rather a procedure to genuinely aid the efficient disposition of cases.  As early as 1988, EOIR recognized that "[w]hen a case is administratively closed, the respondent is allowed. . .to avoid an order regarding his deportability, and the consequences an order of deportation could bring." *Matter of Amico*, 19 I&N Dec. at 654.  To that end, since 2011, administrative closure has been used principally as a policy tool—particularly by Administrations opposed to robust immigration enforcement and adherence to the plain language of statutes—in order to direct the "resolution" of cases to achieve a particular policy outcome, namely the avoidance or indefinite delay of the issuance of an order of removal against as many aliens as possible.  In addition to overriding the decisional independence of adjudicators, this policy of outcome-driven use of administrative closure by EOIR has also established a *de facto* amnesty program unauthorized by Congress.  Indeed, in EOIR's experience, many illegal aliens seek administrative closure when they have no other viable form of relief or protection from removal available; otherwise, they would pursue a meritorious application that would provide them with full lawful status in a timely manner.  Yet, before seeking administrative closure, they often file an application for relief anyway and rely on that application to obtain employment authorization.  Then, once the removal case is administratively closed, because the relief application may remain pending indefinitely, the alien will also continue receiving employment authorization indefinitely with no fear of being removed.  As a result, administrative closure often functions as a *de facto* amnesty program with benefits— *i.e.*, providing illegal aliens both indefinite employment authorization and indefinite protection from removal—which wholly belies its characterization as merely a docket management tool.

### IV.    Additional Legal Questions Surrounding the Use of Administrative Closure

In addition to overriding DHS's prosecutorial discretion, violating basic administrative separation-of-functions principles, and the failure in *Matter of Avetisyan* to explain or acknowledge its departure from prior Board precedent, EOIR's use of administrative closure, including as codified by the ECDM Rule, presents several other problematic legal questions.

First, EOIR's widespread use of administrative closure, to the extent that cases may be closed for decades, creates a serious tension with—if not also a direct violation of—EOIR's regulations requiring cases to be adjudicated in a timely manner. *See*, *e.g.*, 8 C.F.R. § 1003.10(b) ("[i]n all cases, immigration judges shall seek to resolve the questions before them in a timely and impartial manner").  Further, the lack of timely adjudication of approximately 400,000 cases places EOIR at great risk of an onslaught of mandamus petitions. *See* 28 U.S.C. § 1361.  Put simply—and also as a matter of good governance—"[a]n adjudicatory default on that scale strikes directly at the rule of law," *Hernandez-Serrano v. Barr*, 981 F.3d 459, 461 (6th Cir. 2020), and EOIR's "adjudicatory default" due to administrative closure over a long period of time potentially jeopardizes the agency's ability to defend itself from legal challenges.

More troublingly, EOIR's use of administrative closure, including the ECDM Rule, appears to implicate the major questions doctrine.  As discussed, *supra*, the use of administrative closure has effectively become an amnesty program, allowing otherwise illegal aliens to remain in the United States indefinitely—and typically with the benefit of work authorization—without the threat of removal.  However, there is absolutely no statutory authorization for such a program, as there is no such authorization for administrative closure in the first instance.  Moreover, as also noted elsewhere, even the regulatory and adjudicatory bases for it are on questionable administrative law footing. EOIR's assertion of heretofore unknown regulatory authority for the widespread use of administrative closure is of recent vintage and conspicuously fails to assert any statutory basis. Rather, it is a transformative expansion of its authority in order to create a *de facto* amnesty program for hundreds of thousands of aliens.  The absence of any statutory basis for such a program—even beyond the dubious regulatory or adjudicatory basis for it—raises serious separation-of-powers or nondelegation issues for EOIR and squarely implicates the major questions doctrine.

Although "the major questions 'label' may be relatively recent, it refers to an identifiable body of law that has developed over a series of significant cases spanning decades." *Biden v. Nebraska*, 600 U.S. 477, 504-05 (2023) (cleaned up).  As commonly understood, the major questions doctrine requires Congress to have spoken clearly to the assignment of certain authorities to administrative agencies, especially those purporting to address questions "of vast economic and political significance." *Alabama Ass'n of Realtors v. Dept. of Health and Hum. Servs.*, 594 U.S. 758, 764 (2021) (cleaned up).  Put more clearly,

> [t]he major questions doctrine serves a similar function [as the nondelegation doctrine] by guarding against unintentional, oblique, or otherwise unlikely delegations of the legislative power. Sometimes, Congress passes broadly worded statutes seeking to resolve important policy questions in a field while leaving an agency to work out the details of implementation.  Later, the agency may seek to exploit some gap, ambiguity, or doubtful expression in Congress's statutes to assume responsibilities far beyond its initial assignment.  The major questions doctrine guards against this possibility by recognizing that Congress does not usually "hide elephants in mouseholes."  In this way, the doctrine is a vital check on expansive and aggressive assertions of executive authority.

*NFIB v. OSHA*, 595 U.S. 109, 125 (2022) (Gorsuch, J., concurring) (cleaned up).  The doctrine applies "when an agency claims the power to resolve a matter of great political significance or end an earnest and profound debate across the country." *West Virginia v. EPA*, 597 U.S. 697, 743 (2022) (Gorsuch, J., concurring) (cleaned up).

There is no question that immigration, particularly a *de facto* amnesty, is a matter of "great political significance" and subject to "an earnest and profound debate" across the United States.  It is equally clear that EOIR has seized for itself an authority to indefinitely suspend cases without a disposition, administrative closure, that has no statutory basis at all.  That combination—*i.e.* using an authority to effectuate amnesty to hundreds of thousands of otherwise removable aliens without any statutory basis—squarely implicates the major questions doctrine, as Congress has not clearly

7

provided EOIR authority to implement such an amnesty, yet EOIR has nevertheless done so.  As such, EOIR is placed in an uncomfortable position of adhering to a rulemaking that may be potentially unconstitutional.

Whether EOIR's use of administrative closure as a *de facto* amnesty program definitively violates the major questions doctrine is beyond the scope of this Policy Memorandum (PM).[4]  Nevertheless, that question further underscores the myriad of problems EOIR's use of administrative closure, codified in the ECDM Rule, has engendered.  At best, the ECDM Rule appears arbitrary and capricious because it wholly failed to consider several problematic aspects of administrative closure[5] and was wholly contrary to the evidence that administrative closure is neither temporary nor is an effective docket management tool.  *See, e.g., Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency. . .entirely failed to consider an important aspect of the problem [or], offered an explanation for its decision that runs counter to the evidence before the agency. . .").  At worst, it may be *ultra vires* or unconstitutional in violation of the major questions doctrine because it arrogated to EOIR an authority to grant amnesty to hundreds of thousands of illegal aliens without any statutory basis whatsoever.  As such, EOIR could not—and will not— defend the ECDM Rule in good faith against legal challenge.  Nevertheless, until it is rescinded, superseded, enjoined, vacated, or otherwise determined to be unlawful, the changes made by that rulemaking remain binding on EOIR adjudicators.  Accordingly, this PM cannot—and does not purport to—alter that rulemaking's legal effect, and adjudicators should continue to adhere to it unless they have a legal basis for not doing so.

## V.      Conclusion

EOIR's use of administrative closure, particularly between 2011 and 2017 and between 2021 and 2025, was an unmitigated disaster from a policy standpoint and strongly appears to have also been unlawful.  Further, not only did it constitute "[a]n adjudicatory default. . .[that] strikes directly at the rule of law," *Hernandez-Serrano*, 981 F.3d at 461, but in EOIR's experience, it contributed to significant increases in EOIR's adjudicatory backlog.  To the extent DM 22-03 contributed to that "adjudicatory default" it merits cancellation and rescission even if it had not otherwise been effectively superseded by the ECDM Rule, and EOIR's "adjudicatory default" due to administrative closure over a long period of time potentially jeopardizes the agency's ability to defend itself from legal challenges.  Accordingly, DM 22-03 is cancelled and rescinded.

This PM is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States,

---

[4] Apart from potentially implicating the major questions doctrine, EOIR's use of administrative closure—except as required by a judicial settlement agreement—may also be *ultra vires*.  As an administrative agency, EOIR can exercise only authority granted to it by statute, and no statute authorizes administrative closure at all.  *See, e.g., Int'l Union of Elec., Radio and Mach. Workers v. NLRB*, 502 F.2d 349, 352 n.* (D.C. Cir. 1974) ("An administrative agency possesses no such inherent equitable power, however, for it is a creature of the statute that brought it into existence; it has no powers except those specifically conferred upon it by statute.").  Again, this PM does not definitively resolve whether administrative closure, including the ECDM Rule, is an *ultra vires* exercise of authority.

[5] For example, it failed to consider the federalism impacts of an amnesty program on states with high numbers of aliens whose cases have been administratively closed.

its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing herein should be construed as mandating a particular outcome in any specific case. Nothing in this PM limits an adjudicator's independent judgment and discretion in adjudicating cases or an adjudicator's authority under applicable law.

Please contact your supervisor if you have any questions.